UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID JOSEPH COLLOP,

                Plaintiff,          Case No. 12-12159
                                           Honorable Mark A. Goldsmith
                                           Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [10, 15]**

Plaintiff David Joseph Collop ("Collop") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [10, 15], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Collop is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [15] be GRANTED, Collop's Motion for Summary Judgment [10] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On June 11, 2009, Collop filed an application for DIB, alleging a disability onset date of January 15, 2008. (Tr. 95-102). This application was denied initially on November 5, 2009. (Tr. 74-78). Collop filed a timely request for an administrative hearing, which was held on September 29, 2010, before ALJ Michael Finnie. (Tr. 43-71). Collop, who was represented by attorney Thomas Plagens, testified at the hearing, as did vocational expert ("VE") Joyce Shoop. (*Id.*). On October 28, 2010, the ALJ issued a written decision finding that Collop was not disabled. (Tr. 15-24). On March 8, 2012, the Appeals Council denied review. (Tr. 1-3).[1] Collop filed for judicial review of the final decision on May 14, 2012 [1].

B.    **Background**

1.    *Disability Reports*

In a June 19, 2009 disability field office report, Collop reported that his alleged onset date was January 15, 2008. (Tr. 108).

In a June 15, 2009 disability report, Collop indicated that his ability to work is limited by lower back and neck injuries, as well as a tendon injury in his right leg. (Tr. 112). When describing how these conditions limit his ability to work, Collop stated:

> I can't sit or stand for long periods of time. I am in pain most of the time. I can't lift over 10 pounds. I can't walk up and down stairs without assiant [sic]. The pain I have is most of the time. I'm tired all the time. I lay on the ground to get relief. Have a support brace on my right leg for my accilles [sic] tendon. I have had two MRIs on my neck and lower back. I can't sit or stand for long periods of time. I am in pain all of the time.

(*Id.*). Collop reported that these conditions first interfered with his ability to work in 2006, but

---

[1] Collop's motion includes an argument that this review denial was the product of a procedural error. However, Collop later agreed to withdraw that argument, and the court need not address it further. (Doc. #15-1).

he did not become unable to work until January 15, 2008.[2]  (*Id.*).  He indicated that he stopped

working on that date because of "re-injury."[3]  (*Id.*).

Collop completed high school but had no further education.  (Tr. 117).  Prior to stopping

work, Collop worked in a position, from 1996 to January of 2008, loading automobiles onto

railcars for shipment.  (Tr. 113).  In that job, he staged vehicles for shipping, tied them down for

shipping, and otherwise loaded cars for shipment.  (*Id.*).  He was required to walk four hours per

day; stand four hours per day; climb three hours per day; and reach and handle large objects

eight hours per day.  (*Id.*).  He was frequently required to lift 50 pounds, and the heaviest weight

he lifted was 100 pounds.  (Tr. 114).

Collop indicated that he had treated with several medical providers regarding his back,

neck, and Achilles tendon injuries.  (Tr. 114-15).  At the time of the report, he was taking only

extra strength Excedrin and ibuprofen.  (Tr. 116).  He further reported that he had MRIs/CT

scans of his lower back, neck, and right leg in 2007 and 2008.  (Tr. 117).

In a function report dated July 15, 2009, Collop reported that he lives in a house with his

family.  (Tr. 135).  In the morning, he watches television, takes medication, and lies down on the

floor to relieve pain in his back.  (*Id.*).  He takes a nap in the afternoon, then eats dinner with his

family and watches more television.  (*Id.*).  He is unable to care for his children and pets; his

wife attends to both.  (Tr. 136).  When asked what he could do before the onset of his condition

that he is no longer able to do, Collop indicated that he can no longer lift, bend, walk, run, play

sports, or do his job.  (*Id.*).  His conditions affect his sleep, as the pain in his back, neck, and leg

"keep[s] [him] up at night off and on."  (*Id.*).  He is able to attend to his own personal care,

---

[2] Specifically, Collop indicated that he was off work on a worker's compensation leave for six
months during 2006, after which he was able to return to work.

[3] Interestingly, Collop testified at the hearing that he stopped work in January of 2008 because he
was "laid off."  (Tr. 50).

although he only takes showers (not baths) because it is difficult to get into and out of the bathtub. (*Id.*). He must write himself notes in order to remember to take medication and attend to his personal needs. (Tr. 137). He is unable to prepare meals, and he does not do any household chores or yard work, because he cannot stand for more than ten minutes or lift more than ten pounds without pain. (Tr. 137-38). He is, however, able to ride in a car, drive, and leave the house alone. (Tr. 138). He is able to pay bills and count change, but he cannot handle a savings account or use a checkbook because he is "not good with math." (*Id.*). His hobbies include watching sports on television, and he does this every day (although he now uses a heating pad when he is sitting in his chair). (Tr. 139). He does not have problems getting along with family, friends, or neighbors, but, aside from visiting his mother once a month, he does not spend time with others. (Tr. 139-40).

When asked to identify functions impacted by his condition, Collop checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding, and getting along with others. (Tr. 140). Collop can walk two blocks before needing to stop and rest for five to ten minutes. (*Id.*). He can pay attention for only five minutes and does not finish what he starts. (*Id.*). He has no trouble following written or spoken instructions, getting along with authority figures, or handling stress or changes in routine. (Tr. 140-41). He has used a cane and a "brace" since 2006. (Tr. 141).

In an undated disability appeals report, Collop reported that his condition had not changed since his last report. (Tr. 146).

### 2. *Plaintiff's Testimony*

At the September 29, 2010 hearing before the ALJ, Collop testified that he is married and lives in a house with his wife and children. (Tr. 48-49). He is a high school graduate. (Tr. 49).

4

Collop testified that he has not worked since January 2008, when he was laid off from his job loading automobiles onto railcars.  (Tr. 49-50).  Currently, he has pain in his neck, low back, and right leg.  (Tr. 50).  He says that one doctor told him that his neck is "fusing together at two points" and that it makes a "cracking noise" when he moves.  (Tr. 51).  He performs physical therapy exercises at home for his neck, and his doctors have not recommended surgery.  (Tr. 51-52).  In 2005 and 2006, he had injections in his neck, but he then lost his insurance.  (Tr. 51).  Collop also has experienced low back pain since 2004.  (Tr. 52).  He had epidural injections and physical therapy while he had insurance, but no doctor has ever recommended back surgery.  (*Id.*).  Finally, Collop suffered a partial tear of his right Achilles tendon in 2006 and wears a brace on this leg "as much as [he] can" to prevent him from flexing his foot and falling over.  (Tr. 54).

Since April of 2010, Collop has been receiving treatment at the Veterans' Administration ("VA") Hospital in Ann Arbor, Michigan.  (Tr. 53).  He had surgery to repair an umbilical hernia at the VA Hospital in May of 2010.  (*Id.*).  At the time of the hearing, Collop was taking Vicodin for pain (which he claims makes him sleepy, irritable, and constipated), cyclobenzaprine (a muscle relaxant), and hydrochlorothiazide (for high blood pressure).  (Tr. 55-56).

Collop testified that, on a typical day, he gets his daughter breakfast (if it is something simple like toast or cereal) and ensures that she gets to the bus stop on time.  (Tr. 60-61).  After that, he fixes himself some coffee and toast, reads the newspaper, and watches television.  (Tr. 61).  Usually, he will lay down on the ground to stretch his back and neck and then take a nap for "a couple hours."  (*Id.*).  When his children return from school, he gets them snacks and then watches more television.  (*Id.*).  His wife makes dinner, and he spends the rest of the evening either watching television or helping his daughter with homework.  (*Id.*).  He cannot do laundry

or clean the house, and his sons do any necessary yard work.[4]  (Tr. 62).  He is able to dress and groom himself without assistance, with the exception of putting on his socks.  (*Id.*).  He is able to drive but says that he does so only if there is an emergency.  (*Id.*).

Collop testified that it is extremely difficult for him to bend over and pick something up. (Tr. 55).  Even lifting something like a gallon of milk hurts either his shoulders or his low back. (*Id.*).  At least three or four times a day, Collop has to lie down on the floor for 15 to 30 minutes to relieve the pain in his back and neck.  (Tr. 56-57).  He does not believe he could lift and carry even ten pounds on the job, nor stand for two hours or sit for six hours in an eight-hour workday. (Tr. 60).  He ices his neck, uses a heating pad on his low back, and performs stretching exercises daily.  (Tr. 57).  He does not sleep well because of the pain.  (*Id.*).  Collop also testified that he has "an anxiety thing" and that he does not like being around large groups of people.  (Tr. 58).

### 3.    *Medical Evidence*

#### (a)    *Treating Physician Records*

The record contains medical records from several medical providers who treated Collop for low back and neck pain, a partial tear of his right Achilles tendon, and an umbilical hernia. For ease of reference, the court will discuss each set of records by ailment.

#### (1)    *Neck and Low Back Pain*

As stated above, Collop reported that his neck and back pain first interfered with his ability to work in 2006, but it was not until January of 2008 that he became unable to work.  (Tr. 112).  On April 6, 2007, Collop underwent an EMG and nerve conduction study (NCS) to evaluate his neck pain.  (Tr. 166-67).  The study suggested and was consistent with low level left C6 radiculopathy.  (Tr. 167).  Two weeks later, on April 20, 2007, an EMG/NCS study was

---

[4] In May of 2010, however, Collop reported to physicians that he was able to vacuum, climb a flight of stairs, make meals, and wash dishes.  (Tr. 287-88).

performed to evaluate Collop's back pain. (Tr. 168-69). This study was consistent with right L5 radiculopathy. (Tr. 168).

An MRI of Collop's cervical spine, also performed during April of 2007, showed C4-5 facet joint degeneration hypertrophy and mild disc protrusion at the C4-5 level, with bulging discs at C3-4, C5-6, C6-7, and C7-T1. (Tr. 170-72). The impression was multilevel degenerative changes; C6-7 disc herniation with moderate to severe right foraminal stenosis and mild cervical canal and left foraminal stenosis; and mild cervical canal stenosis at C5-6. (Tr. 171). An MRI of the lumbar spine from October of 2006 showed mild progression of degenerative disc disease from L3-4 to L5-S1 and a perineural cyst. (Tr. 174-75). The records also indicate that Collop received a series of lumbar and cervical epidural steroid injections between April and August of 2007. (Tr. 159-65).

It appears that Collop first saw Dr. Moises Alviar at the VA Hospital on April 26, 2010. (Tr. 299-300). At that visit, he complained of an umbilical hernia, as well as neck and low back pain. (Tr. 299). Specifically, Collop complained of "pain and throbbing in the thigh and numbness in the right leg," as well as neck pain that ran down his left arm and hand. (*Id.*). Dr. Alviar noted, however, that on examination, Collop had "no limitation of movements of the joints." (Tr. 300).

On May 11, 2010, Collop underwent MRIs of his cervical and lumbar spine, this time at the VA Hospital. (Tr. 286). The MRIs showed diffuse broad based bulging of the discs at C5-6 and C6-7 partially effacing the ventral subarachnoid space, encroaching the lateral recesses and minimally impinging the nerve root sleeves bilaterally. (*Id.*). They also showed mild broad-based bulging of the discs at L2-3, L3-4, and L4-5, mild central bulging at L5-S1, and perineural cysts. (*Id.*).

7

A progress note from August of 2010 indicates that Collop had seen a neurosurgeon regarding his back pain, but conservative treatment (including physical therapy) was recommended. (Tr. 318). At that visit, Dr. Alviar again documented no focal neurological signs and no limitation of movement of the joints. (*Id.*).

On September 20, 2010, Dr. Alviar completed a Physical Capacities Evaluation in which he opined that Collop could occasionally lift up to 10 pounds, stand and/or walk for 1 hour in an 8-hour work day, sit for 1 hour in an 8-hour work day, and could not engage in repetitive pushing/pulling, grasping, or fine manipulation. (Tr. 368). Dr. Alviar further opined that Collop could not use his feet for repetitive pushing/pulling of leg controls, needed "complete freedom to rest frequently without restriction" during the course of a work day, and needed to lie down for substantial periods of time during the day. (Tr. 369).

*(2)    Achilles Tendon*

It appears that Collop initially suffered a partial tear of his right Achilles tendon in 2006. (Tr. 229). He was released to seated work in October of 2006, and to full work the following month. (Tr. 192, 194).

In June of 2007, he saw Dr. Jack Ryan, complaining of tendonitis and indicating that he was continuing to wear a brace at work, where he tied down automobiles. (Tr. 186). He was diagnosed with Achilles tendonitis in his right calf and was advised to continue wearing his brace. (*Id.*). At a follow-up visit in December of 2007, Collop again reported that he was working while wearing a brace; he was diagnosed with bursitis and tendonitis and was advised to wear a heel pad in his brace. (Tr. 184). At his last visit to Dr. Ryan, in January of 2008, Collop again complained of pain in his heel, and a CT scan was ordered to rule out a stress fracture. (Tr. 182). The results of this CT scan are not included in the record.

8

*(3)     Umbilical Hernia*

In May of 2010, Collop underwent routine surgery to repair an umbilical hernia at the Veterans' Administration Medical Center.  (Tr. 304-09).  At a follow-up visit, Collop reported that he felt fine and had no complaints.  (Tr. 325).

*(b)     Consultative and Non-Examining Sources*

*(1)     Dr. Sadiq*

On October 22, 2009, Collop underwent a consultative physical examination with Dr. A. Sadiq, a physical medicine specialist.  (Tr. 267-68).  Collop presented with a history of low back and neck pain and reported having undergone a MRI, which he claimed revealed three "bad discs" in the lower back – one ruptured, one herniated, and one bulging.  (Tr. 267).  He complained of constant, sharp neck and low back pain, which radiated to the left upper extremity and the lower extremities.  (*Id.*).  Dr. Sadiq noted that, "Accompanying medical record revealed a neck MRI that showed fusing together in between the vertebra."  (*Id.*).  On examination, Collop's muscle strength was 5/5, his deep tendon reflexes were intact, and the straight leg raising, Faber's, Gaenslen's, and femoral stretch tests were all "non-contributory."  (Tr. 268).  In conclusion, Dr. Sadiq's impression was chronic radicular low back pain and chronic sharp radicular neck pain with "no definite objective findings" on examination.  (*Id.*).

*(2)     Residual Functional Capacity Assessment*

On November 5, 2009, state agency medical consultant Muhammad Mian, M.D., completed a physical residual functional capacity ("RFC") assessment.  (Tr. 274-81).  Dr. Mian examined Collop's records and concluded that he retained the ability to perform medium work, in that he could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for 6 hours in an 8-hour work day, sit for 6 hours in an 8-hour work day, and engage in unlimited

pushing/pulling.  (Tr. 275).  Dr. Mian further opined that Collop should only occasionally kneel.  (Tr. 276).

### (3)      Dr. Qadir

On September 16, 2009, Collop underwent a consultative psychological examination with licensed psychiatrist F. Qadir.  (Tr. 248-50).  In his report, Dr. Qadir noted that Collop had been depressed for approximately one year.  (Tr. 248).  Collop reported that he had been unable to work since 2007 and was worried about his children and financial problems.  (*Id.*).  His thought process was well-organized and easy to follow and he denied auditory or visual hallucinations, but he did report feelings of helplessness and sleep loss.  (Tr. 249).  His mood was sad, and his affect was constricted and appropriate.  (*Id.*).  Dr. Qadir diagnosed Collop with adjustment disorder with depressed mood, assigned a Global Assessment of Functioning (GAF)[5] score of 48, and rated his prognosis as "guarded."  (*Id.*).  In summary, Dr. Qadir noted that Collop's "symptoms of depression [were] mostly related to his physical condition and should not cause problems in doing simple jobs."  (*Id.*).

### (4)      Psychiatric Review Technique

On September 24, 2009, Zahra Khademian, M.D., reviewed Collop's records and completed a Psychiatric Review Technique.  (Tr. 252-65).  Dr. Khademian noted that Collop suffers from adjustment disorder, depressed (an affective disorder as defined in Listing 12.04) but this impairment is not severe.  (Tr. 252, 255).  Dr. Khademian opined that Collop is only mildly limited in his activities of daily living, social functioning, and maintaining concentration, persistence, and pace.  (Tr. 262).

---

[5] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

### 4.    Vocational Expert's Testimony

Joyce Shoop testified as an independent vocational expert ("VE").  (Tr. 64-69).  The VE characterized Collop's past relevant work as a railcar loader of automobiles as unskilled in nature, and performed at heavy to very heavy exertion.  (Tr. 64-65).  The ALJ asked the VE to imagine a claimant of Collop's age, education, and work experience, who was able to perform light work that requires occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, standing and walking for six hours in an eight-hour workday, sitting for six hours in an eight-hour workday, and occasional kneeling.  (Tr. 66).  The VE apparently testified that the hypothetical individual would not be capable of performing Collop's past relevant work.[6] (*Id.*).  However, the VE testified that the hypothetical individual would be capable of working in several other light, unskilled positions, including small product assembler (3,700 jobs in Michigan), machine operator (5,700 jobs), and office helper (2,170 jobs).  (Tr. 67).  Upon further questioning by the ALJ, the VE testified that if the hypothetical individual required frequent unscheduled rest periods of 15-20 minutes throughout the day, he would not be able to sustain competitive employment.  (Tr. 69).

### C.    Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

---

[6] Although this portion of the hearing transcript indicates that the VE's testimony was inaudible, the parties do not dispute the conclusion that Collop cannot perform his past relevant work.

11

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Collop is not disabled under the Act.  At Step One, the ALJ found that Collop has not engaged in substantial gainful activity since January 15, 2008, his alleged onset date.  (Tr. 17).  At Step Two, the ALJ found that Collop has the severe impairments of degenerative disc disease of the lumbar and cervical

spine, status post hernia repair, right Achilles tendinopathy, and hypertension.[7]  (Tr. 17-18).  At Step Three, the ALJ found that Collop's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 18-19).

The ALJ then assessed Collop's residual functional capacity ("RFC"), concluding that he is capable of performing light work – in that he can lift and carry 20 pounds occasionally and 10 pounds frequently, can stand and walk for six hours in an eight-hour workday, and can sit for six hours in an eight-hour work day – with only occasional kneeling.  (Tr. 19-22).

At Step Four, the ALJ determined that Collop is unable to perform his past relevant work.  (Tr. 22-23).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Collop is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 23-24).  As a result, the ALJ concluded that Collop is not disabled under the Act.  (Tr. 24).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a

---

[7] The ALJ found that Collop's mental impairment (adjustment disorder with depressed mood) does not constitute a severe impairment.  (Tr. 18).  Collop does not challenge this conclusion.

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.     Analysis

Collop argues that the ALJ's decision is not supported by substantial evidence because the ALJ erred in: (1) failing to consider his 2007 EMG/NCS and MRI test results; (2) rejecting Dr. Alviar's opinion that he had extreme workplace limitations; and (3) evaluating his activities

14

of daily living.  Each of these arguments will be addressed in turn.

1.    *The EMG/NCS and MRI Results Relied on By Collop Do Not Compel a Conclusion that Collop Was Disabled Under the Act*

Collop first points to his cervical and lumbar EMG/NCS and MRI results from 2007 to support his claim of disability.  (Doc. #10 at 13).  While Collop is correct that these test results were consistent with both cervical and lumbar radiculopathy (Tr. 167-68), if anything, these test results undercut his claim of disability.  The ALJ noted that Collop acknowledged that, at the time of these tests, he was working full-time in a physically demanding job, loading automobiles on to railcars.  (Tr. 22, 123-24).  In this job, Collop was frequently required to lift 50 pounds, and occasionally had to lift 100 pounds.  (Tr. 114).  The ALJ also cited Collop's hearing testimony that he stopped working at this job in January of 2008 because he was "laid off" (Tr. 50), not because he was physically unable to perform the work.  (Tr. 22).  Moreover, there is no evidence that Collop only was able to perform his job during this time period by virtue of some extraordinary medical intervention; he was receiving cervical and lumbar epidural injections periodically during 2006 and 2007, but there is no indication that any more radical or invasive treatment was ever suggested or performed for his condition.  (Tr. 21).  The ALJ specifically noted that Collop was never advised by a doctor to have back surgery, never had such a surgery, and "has received only conservative treatment for his back."  (*Id.*).  The ALJ also noted that Collop's "treatment regimen for [his] back complaints has not been particularly extensive since January 2008…"  (*Id.*).  As such, Collop's reliance on the 2007 test results is unavailing.

Additionally, Collop points to MRI results from 2010, which, he asserts, "confirm disc pathology at multiple levels in both plaintiff's cervical and lumbar spines."  (Doc. #10 at 13).  As Collop concedes, however, the ALJ considered these test results and concluded that they showed only "mild or minimal nerve root impingement."  (Tr. 21).  Given that the ALJ properly

15

considered these test results, Collop is left to argue that the ALJ erred in failing to recognize that "while there was no severe encroachment or impingement at any single level, *five different levels* [C5-6, C6-7, L2-3, L3-4, and L4-5] were affected."  (Doc. #10 at 13) (emphasis in original).

As the Commissioner correctly points out, however, the ALJ's discussion of Collop's MRI results makes clear that he understood that there were pathologies at a number of levels, including all of the ones mentioned by Collop.  (Tr. 20-21).  Collop merely asserts – without any legal support whatsoever – that, "The ALJ did not recognize the significance of such widespread damage and pathology, but it clearly would be significant."  (Doc. #10 at 13).  The mere fact that Collop had bulging discs at several levels, most of which were characterized as mild in nature on the 2010 MRI, does not compel a conclusion that Collop was disabled, because, as noted above, he demonstrated an ability to perform very heavy work despite these bulging discs (which existed on the 2007 MRI as well).  (Tr. 170-75).  Collop simply has not shown that the ALJ erred in rejecting Collop's assertion that he was so physically limited that he could only sit or stand for one hour per day at the time of the 2010 MRI, when he was able to lift 50 pounds frequently at the time of the 2007 MRI, and when the changes in pathology between the two MRIs were fairly minimal.

In addition, the ALJ reasonably considered more than merely Collop's EMG/NCS and MRI results, finding that his physical examination results did not suggest a disabling condition. The ALJ noted that there was no indication in Collop's treatment notes of any significant decreased range of motion of his lumbar spine, nor was there objective evidence of significant muscle weakness or atrophy.  (Tr. 21).  Dr. Sadiq, the consultative examiner, noted that, although Collop complained of back and neck pain, there were "no definite objective findings" on examination.  (Tr. 268).  Indeed, Collop's muscle strength was 5/5, his deep tendon reflexes were

16

intact, and the straight leg raising, Faber's, Gaenslen's, and femoral stretch tests were all "non-contributory." (*Id.*). In summary, Collop's argument that the ALJ erred in his consideration of Collop's 2007 and 2010 test results is without merit.

> 2.   *The ALJ's Decision to Reject Dr. Alviar's*
> *Opinion is Supported by Substantial Evidence*

Collop next argues that the ALJ erred in rejecting Dr. Alviar's opinion regarding his workplace limitations, as set forth in a Physical Capacities Evaluation dated September 20, 2010. (Doc. #10 at 14-15). Dr. Alviar opined that Collop could occasionally lift up to 10 pounds, stand and/or walk for 1 hour in an 8-hour work day, sit for 1 hour in an 8-hour work day, and could not engage in repetitive pushing/pulling, grasping, or fine manipulation. (Tr. 368). He further opined that Collop could not use his feet for repetitive pushing/pulling of leg controls, needed "complete freedom to rest frequently without restriction" during the course of a workday, and needed to lie down for substantial periods of time during the day. (Tr. 369). The ALJ considered Dr. Alviar's opinion, but gave it no weight, saying:

> The statement is without any explanation and unconvincing. It does not appear to be based on objective findings, but only on the claimant's subjective complaints. It does not appear to be based on objective diagnostic or clinical findings or narrative treatment notes to support such severe restrictions. In fact there are no narrative treatment notes provided by Dr. Alviar to support the disabling degree of symptomology provided in the opinion statement.

(Tr. 22). Collop argues the ALJ's decision to afford Dr. Alviar's opinion "no weight" was error.

Under the regulations, an ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 CFR §404.1527(c)(2)). If an ALJ declines to give a treating physician's opinion controlling weight,

17

he must then determine how much weight to give the opinion by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source.[8]  *See Wilson,* 378 F.3d at 544.  The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion.  *Id.* (citing 20 C.F.R. §404.1527(c)(2)).

Here, the ALJ gave good reasons for giving Dr. Alviar's opinion no weight, and those reasons are supported by substantial evidence in the record.[9]  First, the ALJ correctly noted that Dr. Alviar's opinion was devoid of explanation and conclusory in nature.  (Tr. 22).  Given the fact that Dr. Alviar was imposing extreme limitations on Collop (for example, the need to "lie down for substantial periods of time during the day" and to have "complete freedom to rest frequently without restriction") (Tr. 369), the ALJ reasonably expected some proper explanation of the basis for these conclusions.  This is particularly true where, less than three years earlier, Collop was able to perform very heavy work, and there is no objective evidence of a significant worsening in his condition over time.  The lack of explanation for Dr. Alviar's opinion was a

---

[8] The ALJ is not required to discuss in detail each one of these factors.  *See Francis v. Commissioner Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis.") (internal quotations omitted).

[9] As the Commissioner points out, there is some question as to whether Dr. Alviar should even be considered a treating physician, since Dr. Alviar saw Collop only twice before he completed the Physical Capacities Evaluation.  (Doc. #15 at 12).  The regulations explicitly provide that, "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."  20 CFR §416.927(c)(2)(i).  Since Collop saw Dr. Alviar only twice, the reasoning for affording greater weight to the opinion of a treating physician seems not to apply.  Nevertheless, for purposes of ruling on the cross-motions for summary judgment, the court will assume (as the ALJ apparently did) that Dr. Alviar was Collop's treating physician and evaluate his opinion accordingly.

valid factor to be considered by the ALJ. *See* 20 C.F.R. §404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Moreover, the ALJ noted that Dr. Alviar's opinion was not supported by any narrative treatment notes. (Tr. 22). This too is an appropriate factor to be considered. *See* 20 C.F.R. §404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). In fact, Dr. Alviar's treatment notes actually belie his conclusion that Collop suffered extreme workplace limitations. At Collop's April 2010 visit, Dr. Alviar documented no focal neurological signs and no limitation of movement of the joints, and Collop was advised to follow up in 3-4 months. (Tr. 356, 358). When Collop next saw Dr. Alviar, in August of 2010, the physical examination again documented no focal neurological signs and no limitation in movement of the joints, and no abnormalities in the musculoskeletal or neurological systems were noted. (Tr. 318). Collop was told to follow up in 4-5 months. (Tr. 320). Thus, the ALJ's conclusion that Dr. Alviar's treatment notes fail to support "the disabling degree of symptomology provided in the opinion statement" (Tr. 22) is supported by substantial evidence.[10]

Lastly, Collop argues that the ALJ erred in rejecting Dr. Alviar's opinions because they "represent the *only* opinions on this record which incorporate plaintiff's difficulties with his umbilical hernia . . . ." (Doc. #10 at 15). This argument has no merit. There is no evidence in the record that Collop's hernia, which was surgically repaired in May of 2010, caused (or could be expected to cause) limitations that are anywhere near as extreme as those imposed by Dr. Alviar. Indeed, prior to the surgery, Collop told his hernia surgeon that the pain from the hernia

---

[10] Other VA records also undercut Dr. Alviar's stated limitations: for example, a nurse practitioner who evaluated Collop prior to his hernia surgery noted no neurological abnormalities, and reported that Collop denied a reduced range of motion or pain in the neck. (Tr. 346-47).

was only a 2/10 and that it came and went (Tr. 292); there is simply no reason to believe that this mild, intermittent pain would result in the severe functional limitations imposed by Dr. Alviar. Moreover, after the hernia repair surgery, Collop reported that he felt fine and had no complaints. (Tr. 325).   The surgeon recommended that he follow up as needed but did not describe any functional limitations resulting from the surgery.  (*Id.*).

In summary, the ALJ appropriately considered the factors set forth in the regulations in determining what weight to give Dr. Alviar's opinion.   In addition to the factors explicitly discussed by the ALJ and addressed above, the length of Collop's treatment relationship with Dr. Alviar (only two visits[11] prior to Dr. Alviar's completion of the Physical Capacities Evaluation), the frequency of examination (four months between those two visits), and Dr. Alviar's lack of specialization (the record describes him as a primary care provider) (Tr. 302) are all factors to be considered and further support the ALJ's conclusion that Dr. Alviar's opinion is not entitled to controlling weight.   For all of these reasons, the ALJ's decision to give no weight to Dr. Alviar's opinion is supported by substantial evidence.

### 3.   The ALJ Properly Considered Collop's Activities of Daily Living

Lastly, Collop criticizes the ALJ's evaluation of his activities of daily living, saying that the ALJ "vastly overstated" the significance of the activities he performs, and citing his hearing testimony in support of this proposition.  (Doc. #10 at 15-16).   A review of the record, however, reveals that the ALJ did not misstate Collop's activities of daily living but, rather, accurately summarized Collop's hearing testimony, as well as statements he made in disability reports.

---

[11] Collop asserts in his motion that Dr. Alviar saw him "on several occasions." (Doc. #10 at 14). However, the record citations for this proposition do not support this claim:  only one of the citations offered by Collop is to an actual clinic visit (Tr. 318-20); the others include a telephone contact (Tr. 286), a pre-surgery examination by a nurse practitioner (Tr. 288), and an addendum regarding smoking cessation and fall risk that does not suggest an office visit (Tr. 302-03).

With respect to Collop's activities of daily living, the ALJ stated:

> He is independent in self-care and grooming except for shoes and socks, feeds his daughter and walks her to the school bus stop in the morning, fixes snacks for his children, and drives occasionally.

(Tr. 22). All of these observations are supported by substantial evidence in the record. (Tr. 61 (Collop gets his daughter breakfast if she wants toast or cereal, walks his daughter to the bus stop, and gets his children snacks after school), 62 (Collop is able to dress and groom himself "except for [his] shoes and socks, Collop drives "on an occasion")). Thus, contrary to Collop's assertions, the ALJ has not "overstated" this evidence; indeed, statements Collop made to medical providers at the VA Hospital in May of 2010 actually suggest that he is able to do more than what he admitted at the hearing. (Tr. 287-88) (Collop stated that he "does vacuuming, climbs a flight of stairs, makes meals & does wash dishes"). Moreover, the ALJ did not completely reject Collop's assertions regarding "his physical impairments and their impact on his ability to work," and instead noted that they "were only partially credible in light of the reports of the treating and examining practitioners, the medical history and degree of medical treatment required, the findings made on examination, and [Collop's] own description of his activities and lifestyle." (Tr. 21). Clearly, Collop's personal activities were only one of many pieces of evidence considered by the ALJ, and the court concludes that the ALJ's reliance on Collop's testimony as to his activities of daily living is supported by substantial evidence.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [15] be GRANTED, Collop's Motion for Summary Judgment [10] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: January 31, 2013                            s/David R. Grand
Ann Arbor, Michigan                                DAVID R. GRAND
                                                   United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 31, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager